**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00455-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00457-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00459-ADA** |
| *Plaintiff,* | § | **CIVIL ACTION 6:20-cv-00463-ADA** |
| | § | |
| **v.** | § | |
| | § | |
| **MICROSOFT CORPORATION,** | § | |
| *Defendant.* | § | |

**WSOU'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... ii

Exhibits ........................................................................................................................... v

I.  CLAIM CONSTRUCTION LEGAL STANDARDS ......................................................... 1

II.  U.S. PATENT NO. 7,750,286 (Case No. WA:20-cv-00459-ADA) ................................... 2

  A.  Disputed Terms for the '286 Patent ................................................................. 2

    1.  "polarization beam splitter (PBS)" (Claim 15) ............................... 2

    2.  "quarter-wave plate" (Claim 15) ...................................................... 5

    3.  "spatial light modulator (SLM)" (Claim 15) ................................... 6

III.  U.S. PATENT NO. 8,226,241 (Case No. WA:20-cv-00463-ADA) .................................. 8

  A.  Disputed Term for the '241 Patent ................................................................... 8

    4.  "spatial light modulator" (Claim 15) ............................................. 8

IV.  U.S. PATENT NO. 8,965,978 (Case No. WA:20-cv-00457-ADA) .................................. 8

  A.  Agreed Term for the '978 Patent ....................................................................... 8

    5.  "gaining" (Claims 1 and 12) ............................................................. 8

  B.  Disputed Terms for the '978 Patent ................................................................. 10

    6.  "third-party lobby" (Claim 1 and 12) ............................................ 10

    7.  "lobby" (Claim 12) ............................................................................. 12

V.  U.S. PATENT NO. 9,814,988 (Case No. WA:20-cv-00455-ADA) .................................. 12

  A.  Disputed Term for the '988 Patent ................................................................... 12

    8.  "adaptor unit" (Claim 20) ............................................................... 12

## TABLE OF AUTHORITIES

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013) ............................................................................... 2

*Castlemorton Wireless, LLC v. Bose Corp.*,
   6:20-CV-00029-ADA, 2020 WL 6578418 (W.D. Tex. July 22, 2020) ................................. 10

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ............................................................................... 1

*Cont'l Circuits LLC v. Intel Corp.*,
   915 F.3d 788 (Fed. Cir.) ...................................................................................... 11, 12

*Dayco Prods., Inc. v. Total Containment, Inc.*,
   258 F.3d 1317 (Fed. Cir. 2001) .......................................................................... 11, 12

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
   946 F.3d 1367 (Fed. Cir. 2020) ............................................................................... 6

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
   381 F.3d 1352 (Fed. Cir. 2004) ........................................................................... 1, 13

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ............................................................................... 13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ................................................................................ 1

*Mangosoft, Inc. v. Oracle Corp.*,
   525 F.3d 1327 (Fed. Cir. 2008) ............................................................................... 2

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
   448 F.3d 1309 (Fed. Cir. 2006) ............................................................................... 2

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... passim

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ............................................................................... 15

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
   988 F.2d 1165 (Fed. Cir. 1993) ............................................................................... 13

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................................................... 2

*Unwired Planet, LLC v. Apple Inc.*,
    829 F.3d 1353 (Fed. Cir. 2016) ............................................................................ 11

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................ 2

**EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Appl. Ser. No. 11/765,155, Not. Of Allow. of 02/23/10. |
| B | MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008). |
| C | M. Shokooh-Saremi et al., Design of Multilayer Polarizing Beam Splitters Using Genetic Algorithm, 233 *Optics Communications* 57 (2004) at 57. |
| D | David W. Ball, *Field Guide to Spectroscopy* (2004) at 28. |
| E | Eugene Hecht, *Optics* (3rd ed. 1998), at 349 (Microsot_HoloLens_WSOU000003941). |
| F | Cardinal Warde et al., Charge-Transfer-Plate Spatial Light Modulators, 31 *Applied Optics* 20, at 3971 (Jul. 10, 1992). |
| G | Spatial Light Modulator, Wikipedia, (archived Sept. 13, 2006) https://web.archive.org/web/20060913000000/https:/en.wikipedia.org/wiki/Spatial_light_modulator. |
| H | Appl. Ser. No. 11/393,900, Response of 07/10/09. |
| I | Appl. Ser. No. 11/393,900, Amendment of 01/11/10. |
| J | Appl. Ser. No. 11/393,900, Not. of Allow. of 10/07/14. |

Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development ("WSOU") submits the following Opening Claim Construction Brief pursuant to the Orders Governing Proceedings and Scheduling Orders in the above-listed cases.

## I.    CLAIM CONSTRUCTION LEGAL STANDARDS

Generally, claim terms are given their plain and ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *accord Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1355 (Fed. Cir. 2004) (citations and quotations omitted) ("[N]ormal rules of usage create a 'heavy presumption' that claim terms carry their accustomed meaning in the relevant community at the relevant time."). The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313.

"'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)). In particular, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

When construing claim terms, courts may also consult extrinsic evidence, including dictionaries. *See Phillips*, 415 F.3d at 1319. But extrinsic evidence is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic

evidence should only be used to help the court come to the proper understanding of the claims; the ultimate construction given to the claims should be grounded in the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996); *Mangosoft, Inc. v. Oracle Corp*., 525 F.3d 1327, 1329-30 (Fed. Cir. 2008); *Old Town Canoe Co. v. Confluence Holdings Corp*., 448 F.3d 1309, 1316 (Fed. Cir. 2006).

The "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* To disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must represent "a clear disavowal of claim scope." *Id.* at 1366. Accordingly, when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## II.    U.S. PATENT NO. 7,750,286 (CASE NO. WA:20-CV-00459-ADA)

### A.    Disputed Terms for the '286 Patent

#### 1.    "polarization beam splitter (PBS)" (Claim 15)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning | optical component with two conjoined prisms, each of which reflects light of one polarization and transmits light of an orthogonal polarization |

The term "polarization beam splitter (PBS)" requires no construction for the following reasons.

2

***First***, the term "polarization beam splitter (PBS)" is a term of art. As noted, plain and ordinary meaning is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313. The term's status as a term of art is indicative by the specification's introduction of the term "polarization beam splitter (PBS)" without explaining what that term means. For instance, the term "polarization beam splitter" first appears in the Title. *See* '286 patent at Title ("Compact Image Projector Having a Mirror for Reflecting a Beam from a *Polarization Beam Splitter* Back to the *Polarization Beam Splitter*").[1] The Application that led to the issuance of the ''286 patent was initially drafted with the Title of "Compact Image Projector," and the Examiner via an Examiner's Amendment appended the phrase "Having a Mirror for Reflecting a Beam from a Polarization Beam Splitter Back to the Polarization Beam Splitter." Appl. Ser. No. 11/765,155, Not. Of Allow. of 02/23/10, at 2 (**Ex. A**). The MPEP instructs Examiners that patent titles must be "brief but *technically accurate* and descriptive," and instructs Examiners to require the substation of a new title that is "*clearly indicative* of the invention to which the claims are directed." MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008) (**Ex. B**). The Examiner's appending the term "polarization beam splitter" to the title demonstrates that the term is both "technically accurate" and "clearly indicative." *See id.* Accordingly, the term "polarization beam splitter" undoubtedly has a plain and ordinary meaning. Other portions of the '286 patent use the term "polarization beam splitter" or its acronym "PBS" without providing definitions. *See, e.g.,* '286 patent at 3:8. The absence of any definition in the specification is further indicative that a POSITA would understand a plain and ordinary meaning for "polarization beam splitter (PBS)." The Court need not construe this term.

***Second***, Microsoft also errs by arbitrarily limiting the term "polarization beam splitter

---

[1] Emphasis is added unless otherwise noted.

(PBS)" to one specific configuration of a polarization beam splitter, when the broader concept is claimed. In particular, Microsoft's construction attempts to redraft the plain language as "optical component *with two conjoined prisms, each of which reflects light of one polarization and transmits light of an orthogonal polarization*." But Microsoft's construction fails to acknowledge that a POSITA would have understood "polarization beam splitter (PBS)" to have encompassed a definition at least two different configurations:

> Plate and cube are the main two configurations of thin film PBSs. In the plate type, the layers are deposited on a plane substrate while in the cubic form, the layers are deposited on the hypotenuse of two prisms and then these prisms are cemented together with an optical adhesive to produce a cube [1].

M. Shokooh-Saremi et al., Design of Multilayer Polarizing Beam Splitters Using Genetic Algorithm, *Optics Communications* 233 (2004) 57, at 57 (**Ex. C**); *see also* David W. Ball, *Field Guide to Spectroscopy* (2004) at 28 ("A beamsplitter is an optical component that allows part of an electromagnetic beam to pass through and reflects the rest. Beamsplitters can be cemented right prisms or partially silvered mirrors.") (**Ex. D**). Microsoft's inclusion of the phrase "with two conjoined [which can be cemented] prisms, each of which reflects light of one polarization" would only encompass the cube or cubic configuration and would exclude the plate PBS configuration. This deviation from the plain and ordinary meaning is improper.

*Third*, the claim language itself refutes Microsoft's incorrect definition. For example, independent claim 15 recites a "polarization beam splitter (PBS)" and then dependent claim 17, which indirectly depends on claim 15, recites that "the PBS comprises *a beam-splitting cube*." The doctrine of claim differentiation proscribes incorporating into an independent claim a limitation (such as the "beam-splitting cube") that is introduced in a dependent claim. *Phillips,* 415 F.3d at 1315 ("The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.") (citation

omitted). As explained in the prior paragraph, the concept of the "beam-splitting cube" is synonymous with "two conjoined prisms" in Microsoft's proposed constructions. Thus, Microsoft's proposed construction violates the doctrine of claim differentiation.

### 2. "quarter-wave plate" (Claim 15)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | optical component that shifts a polarized light beam passing therethrough by one quarter wavelength |

The term "quarter-wave plate" requires no construction for the following reasons.

**First**, the term "quarter-wave plate" is a term of art. As noted, plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313. As with the previous term, "quarter-wave plate" is used throughout the specification without further defining the term. *See e.g.,* '286 patent at 43-49. This lack of a definition demonstrates that a POSITA at the time of the invention understood the term to have a plain and ordinary meaning.

**Second**, Microsoft errs by arbitrarily limiting the term "quarter-wave plate" by including the phrases "polarization light beam passing therethrough." A POSITA would have understood a "quarter-wave plate" to not be limited to "polarization light beam passing therethrough." For instance, textbooks that existed at the time of the invention described quarter wave plate as including "optical element[s] that introduce[] a relative phase shift of $\Delta \varphi = \pi/2$ between the constituent orthogonal o- and e-components of a wave." E. Hecht, *Optics* (3rd ed. 1998), at 349 (Microsot_HoloLens_WSOU000003941) (**Ex. E**). A POSITA would thus not have included the phrase "polarization light beam passing therethrough" given this broad understanding of the term "quarter-wave plate."

**Third**, Microsoft's proposed construction is also flawed by requiring that the shift in

wavelength is rigidly "one quarter wavelength" without the ability for minor variations of about one quarter wavelength. The specification describes at least one embodiment of a quarter wave plate where the shift is "*about* one quarter of a wavelength." '286 patent at 3:16. While quarter wave plate is not limited to this particular embodiment in the specification, narrowly defining a "quarter-wave plate" to exactly product a shift of one quarter wave (as Microsoft proposes) should be rejected for excluding a preferred embodiment. *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*, 946 F.3d 1367, 1373 (Fed. Cir. 2020) ("[a] claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") (quoting *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378–79 (Fed. Cir. 2013), which quotes *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)).

### 3.   "spatial light modulator (SLM)" (Claim 15)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning | optical component with a 2-dimensional arrangement of pixels that displays an image |

The term "spatial light modulator (SLM)" requires no construction for the following reasons.

**First**, the term "spatial light modulator (SLM)" is a term of art and should be accorded the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313. Just as with the prior two terms, the introduction of the term "spatial light modulator (SLM)" in the specification and subsequent references are all made without defining the term. This lack of a definition is indicative that the term would have a plain and ordinary meaning to a POSITA. For instance, the term "spatial light modulator" first appears in the Abstract without any definition of what that term means. *See* '286 patent at Abstract ("A

representative embodiment of the invention provides a compact image projector having a light source coupled to a spatial light modulator (SLM).”). “The purpose of the abstract is to enable the United States Patent and Trademark Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure.” 37 CFR §1.72. And an abstract should “sufficiently describe the disclosure to assist readers in deciding whether there is a need for consulting the full patent text for details.” MPEP §608.01(b) (8th ed. Rev. 7 July 2008) (**Ex. F**). The term is then used in the specification without any explanation of what that term means. *See* ’286 patent at 1:26-28. As with the two prior terms, the lack of any definition for this term demonstrates that POSITA would understand a plain and ordinary meaning for “spatial light modulator (SLM).” Accordingly, no construction is required by the Court.

*Second*, Microsoft errs by arbitrarily limiting the term “spatial light modulator (SLM)” to one configuration, when the broader term concept is claimed. In particular, Microsoft’s construction limits to “optical component *with a 2-dimensional arrangement of pixels that displays an image*.” The specification describes the context of that a SLM merely as “adapted to spatially modulate the beam.” ’’286 patent at 1:50. Moreover, a POSITA at the time of the invention would not apply such a narrow understanding of the plain and ordinary meaning. SLMs were described more broadly at the time of the invention:

> SLM’s modify the amplitude, phase, polarization, or intensity of a readout light beam in response to either the intensity of a second write-light beam or to a two-dimensional electrical voltage or current pattern.

Cardinal Warde et al., Charge-Transfer-Plate Spatial Light Modulators, 31 *Applied Optics* 20, at 3971 (Jul. 10, 1992) (**Ex. F**).

> A “spatial light modulator” (SLM) is an object that *imposes some form of spatially-varying Modulation on a beam of light*…. Usually, an SLM modulates the Intensity of the light beam, however *it is also possible to produce devices that modulate the phase of the beam or both the intensity and the phase simultaneously*.

Spatial Light Modulator, Wikipedia, (archived Sept. 13, 2006) https://web.archive.org/web/20060913000000/https://en.wikipedia.org/wiki/Spatial_light_modulator (**Ex. G**). A POSITA would thus not have understood the term "spectral light modulator" to be limited to those "with a 2-dimensional arrangement of pixels that displays an image" as Microsoft contends.

## III.    U.S. PATENT NO. 8,226,241 (CASE NO. WA:20-CV-00463-ADA)

### A.    Disputed Term for the '241 Patent

#### 4.    "spatial light modulator" (Claim 15)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning | optical component with a 2-dimensional arrangement of pixels that displays an image |

For both the '241 patent and the previously-discussed '286 patent, the parties take the same position with respect to claim construction (or lack thereof). As with the '286 patent, WSOU asserts that no construction is required for the term in the '241 patent and that the plain and ordinary meaning should apply. Given this position, WSOU incorporates by reference arguments made in Section II.A.3., above. WSOU reserves the right to make any patent-specific arguments should Microsoft raise them.[2]

## IV.    U.S. PATENT NO. 8,965,978 (CASE NO. WA:20-CV-00457-ADA)

### A.    Agreed Term for the '978 Patent

#### 5.    "gaining" (Claims 1 and 12)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| gaming | gaming |

The parties agree that the term "gaining" (first recited in issued claim 1 and also recited in

---

[2] While the inventor of the '241 patent is also one of the two co-inventors of the '286 patent, the two patents are not related in that they do not rely or result from a common application.

issued claim 12) should be construed as "gaming." The word "gaining" was introduced by a USPTO clerical error and should be construed here as "gaming" to correct that error. This error appears to have been introduced by the failure of the USPTO's processes to properly recognize text a scanned document in the file history. Two amendments to application claim 12 (which issued as claim 1 in the '978 Patent) reveal that the term as originally submitted recited "gaming":

> 12.       (Currently Amended) A  method for forming one or more groups associated with one or more sessions comprising:
>
>         receiving one or more identities of one or more third party users;
>
>         comparing profiles of the identified third party users, with attributes of a request to initiate [[a]] an online gaming session, to determine if any of the third party users are qualified to participate in the session; and forming a group containing those third party users that qualify to participate in the session along with a user that initiated the request.

Appl. Ser. No. 11/393,900, Response of 07/10/09, at 2-3 (highlighting added) (**Ex. H**).

> 12.       (Currently Amended) A method for forming one or more groups associated with one or more online gaming sessions comprising:
>
>         receiving one or more identities of one or more third party users;
>
>         comparing profiles of the identified third party users, with attributes of a request to initiate an online gaming session, to determine the gaming skill level of if any of the third party users are qualified to participate in the session; and
>
>         forming a gaming group containing those third party users that have the substantially same gaming skill level as that required by the request qualify to participate in the session along with a user that initiated the request.

Appl. Ser. No. 11/393,900, Resp. of 01/11/10, at 3 (highlighting added) (**Ex. I**).

The USPTO made a similar error with respect to application claim 26, which issued as claim 12 in the '978 patent. Appl. Ser. No. 11/393,900, Resp. of 01/11/10, at 4. The USPTO eventually issued a Notice of Allowability, which included an Examiner's Amendment intentionally amending certain claim language in application claims 12 and 26 unrelated to "gaming."  Appl. Ser. No. 11/393,900, Not. of Allow. of 10/07/14, at 4-5 (**Ex. J**). But the Examiner's Amendment inadvertently replaced the word "gaming" with "gaining." *Id.* The ''978 patent issued with the

"gaining" language in the claims.

"[D]istrict courts may correct an error in a patent where no certification has been issued if: (1) the correction is not subject to reasonable debate to a person of ordinary skill in the art based on consideration of the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims." *Castlemorton Wireless, LLC v. Bose Corp.*, 6:20-CV-00029-ADA, 2020 WL 6578418, at *2 (W.D. Tex. July 22, 2020). Here, both prongs are met. First, the parties both agree that the term "gaining" should mean "gaming," and, thus, the correction is not subject to a reasonable debate. Second, the prosecution history does not suggest a different interpretation as noted above.

### B.   Disputed Terms for the '978 Patent

### 6.   "third-party lobby" (Claims 1 and 12)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning | lobby separate from the local lobby associated with the gaming session |

The term "third party lobby" requires no construction for the following reasons.[3]

*First*, both "third party" and "lobby" are terms that have a plain and ordinary meaning in the recited context. For instance, Microsoft tacitly concedes that "third party" has a plain and ordinary meaning by not identifying the different term—"third party users" in claim 1 and 12—as requiring construction. If "*third party* users" is subject to plain and ordinary meaning and does not require construction, the same should be true for the term "*third party* lobby."

*Second*, the surrounding claim language provides context to define, in part, "third party

---

[3] Claim 1 only recites to "third party lobby," and never refers to a standalone reference to just "lobby" as in claim 12. Accordingly, WSOU has ordered "lobby" after "third party lobby" in this Brief pursuant to the OGP. To the extent Microsoft argues that its proposed definition of "lobby" should be incorporated into "third party lobby," WSOU refers to and incorporates by reference its arguments made with respect to "lobby" below.

lobby." Claim 1 recites the step of "comparing profiles of the identified and available *third party users*, with attributes of *a request* to initiate an online gaming session of a game by a user…" '978 patent at 10:11-13. The "request" is then referenced in claim 1 in the step for "forwarding requirements of the request on to *a third party lobby to identify the third party users that satisfy the request*." *Id.* at 10:24-26. Thus, the claim language—and in particular the relationship between the "request" and "third party lobby"—is definitive by itself.

**Third**, Microsoft errs by seeking to redraft the term "third party lobby" as "lobby *separate from the local lobby associated with the gaming session*." Microsoft impermissibly seeks to add limitations (noted in italic in the previous sentence) neither required by claim terms nor unambiguously required by either the specification or the prosecution history. *See*, *e.g.*, *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796–97 (Fed. Cir.), *cert. denied*, 140 S. Ct. 648 (2019); *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001); *see also Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358, (Fed. Cir. 2016) (noting that because the disputed claim term did not specify *how* the input was transmitted, the term was broad enough to cover a voice input transmitted over a voice *or* data channel, and it thus was error to construe "voice input" to be limited to a voice input transmitted over a voice channel).

**Fourth**, Microsoft's erroneous construction also unnecessarily injects ambiguity into a straightforward term that should simply be afforded its plain and ordinary meaning. The phrase "local lobby" in Microsoft's proposed construction is not recited in any of the claims. Adding the term "local lobby" will thus needlessly confuse the jury, especially when Microsoft's proposed construction requires that the "third party lobby" be "separate from" the "local lobby." As claim 1 recites, a "third party lobby" is merely a lobby to "to identify the third party users that satisfy the request."  There is no need to interject the notion of "local lobby" and "separate" when those terms

11

are not claimed.

### 7.    "lobby" (Claim 12)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning | software and/or hardware that matches users to form groups |

The term "lobby" requires no construction for the following reasons.

*First*, as noted above with respect to the previous term, "lobby" has a plain and ordinary meaning in the recited context. There is no need for the Court to construe this easily understood term.

*Second*, the surrounding claim language provides context to define, in part, "lobby." Claim 12 first recites "a memory storing instructions to implement *a lobby, the lobby operable to receive one or more identifies of one or more third party users*." '978 at 11:5-7. Thus, the surrounding claim language provides context to the plain and ordinary meaning of this term.

*Third*, Microsoft errs by seeking to redraft the term "lobby" as "software and/or hardware that matches users to form groups." The claim language, however, does not reference "software," "hardware," or "matches." The entirety of Microsoft's proposed construction impermissibly seeks to add these limitations neither required by claim term "lobby" nor unambiguously required by either the specification or the prosecution history. *See*, *e.g.*, *Cont'l Circuits*, 915 F.3d 788 at 796–97; *Dayco,* 258 F.3d at 1327.

## V.    U.S. PATENT NO. 9,814,988 (CASE NO. WA:20-CV-00455-ADA)

### A.    Disputed Term for the '988 Patent

### 8.    "adaptor unit" (Claim 20)

| WSOU's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | a device, having a video receiver, hard disk, and CPU that encodes video data, that provides |

| | a game console with access to interactive services |
|---|---|

The "adaptor unit" term requires no construction. Consistent with the "heavy presumption" for plain and ordinary meaning, *see Home Diagnostics*, 381 F.3d at 1355, the Court should give effect to the terms chosen by the patentee. Microsoft's proposed construction for "adaptor unit" should be rejected as deviating from the term's plain and ordinary meaning, conflicting with intrinsic evidence, and erroneously rewriting the claims. *See*, *e.g.*, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.") (internal quotes omitted).

***First***, Microsoft errs in attempting to rewrite "unit" as "device" in this context. Nothing in either the '988 patent itself or its prosecution history compels the erroneous rewrite Microsoft proposes. While the term "adaptor unit" appears throughout the '988 patent in various contexts, the word "device" is not applied to describing the "adaptor unit" itself. For instance, "device" is recited with respect to "other devices (such as a personal computer)" or "other computer devices." '988 patent at 5:42-43; 6:33-35. The word "device" also appears in the claims with respect to a "large capacity storage device." The word "device" is not used in the claims or specification to describe the "adaptor unit." There is no reason to substitute the word selected by the patentee—"unit."

***Second***, WSOU anticipates that Microsoft will allege the patentee acted as his own lexicographer by describing, in part, an exemplary embodiment in the specification as follows:

> As shown, the adaptor unit 3 includes a television tuner 31 for receiving video signals from the overhead satellite 13 or the broadcast transmitter 11 via the television aerial 15….The adaptor unit 3 also includes a hard disk 39 into which received video files can be recorded for subsequent play out to the user on the television 5. In this embodiment, the video data received by the 30 television tuner 31 and the ADSL modem 33 is encoded MPEG video data that is encrypted using the 3DES encryption technique….A central processing unit (CPU) 47 runs a decryption module 49 stored in a memory 51 using the decryption key 41 to decrypt the received video data. The adaptor unit CPU 47 then re-encrypts the decrypted video data using an encryption module 53 stored 40 in the memory 51 together with

an encryption key 53 (labelled Key 2) stored on the smart-card 43.

'988 patent at 2:8-41. This description, however, expressly pertains to "an exemplary embodiment."
'988 patent at 1:37. It is not unambiguously offered as explicit lexicography that necessarily
pertains universally to *all* adaptor units in *all* disclosed embodiments.

Moreover, the claim language of both asserted and unasserted claims does not support
Microsoft's proposed construction. In particular, asserted claim 20 does not expressly recite the
"adaptor unit" having any additional structural limitations that Microsoft contends (e.g., "video
receiver, hard disk, and CPU"). Asserted claim 20 is reproduced below with the term "adaptor unit"
highlighted:

20. A games console for use with an ==adaptor unit==, the games console comprising:
    a console housing;
    a game interface within said console housing configured to receive a game
        product;
    a display interface within said console housing configured to interface said
        games console to a display;
    a user interface within said console housing for receiving user input;
    a game controller within said console housing configured to receive game
        data from said game interface, to receive said user input from said
        user interface, and to generate therefrom game video data for output
        to said display interface, wherein the game controller is responsive
        to the user input from the user interface and configured to transmit
        game history data to the ==adaptor unit==;
    an adaptor interface within said console housing configured to couple the
        games console with said ==adaptor unit==;
    a memory within the console housing configured to store software
        modules; and
    a console processor within the console housing configured to execute the
        software modules stored in the memory;
    wherein the games console is configured to receive a video player software
        module from the ==adaptor unit==, store the video player software
        module in the memory, use the console processor to execute the
        video player software module, receive encoded video data from the
        ==adaptor unit==, and use the video player software module to generate
        decoded video data from the received encoded video data for output
        to the display via the display interface;
    wherein, in response to user input including a first user activation to request
        that a current position in a first game be saved, the game controller
        is configured to transmit a first request to the ==adaptor unit== to save
        the current position in the first game and corresponding game
        history data in the ==adaptor unit==;

14

> wherein, in response to user input including a second user activation to request to resume play of the first game or a second game from a saved position, the game controller is configured to transmit a second request to the ==adaptor unit== for retrieval of the saved position and corresponding saved game history data for the corresponding game from the ==adaptor unit== and to resume play of the corresponding game from the saved position using the saved game history data.

'988 patent at 10:25-11:5 (highlighting added).

In contrast, claim 1 (which is not presently asserted) does includes express claim limitations on what the "adaptor unit" comprises, including a "video data receiver" and a "large capacity storage device" (which is not limited to but would encompass a hard disk):

> wherein said adaptor unit comprises:
>> an adaptor housing;
>> a memory within the adaptor housing configured to store a video player software module;
>> a ==video data receiver== within said adaptor housing configured to receive encoded video data from a remote video provider;
>> a games console interface within said adaptor housing configured to interface said adaptor unit to said adaptor interface of said games console;
>> a communications controller within said adaptor housing configured to control communications between the adaptor unit and said games console via said games console interface and said adaptor interface; and
>> a ==large capacity storage device== configured to store at least one of the encoded video data, game video data, and game data;

'988 patent at 7:45-62 (highlighting added).

Given "adaptor unit" is recited in both claim 1 and 20, Microsoft's proposed construction of "adaptor unit" is nonsensical as it would render "video data receiver" and "large capacity storage device" claim language of unasserted claim 1 superfluous. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("interpretations that render some portion of the claim language superfluous are disfavored."). In other words, if as Microsoft contends, an "adaptor unit" always requires a "video receiver" and a "hard disk" there would have be no need for the patentee to expressly add the equivalent of those terms in unasserted claim 1.

Dated: January 8, 2021             Respectfully submitted,

By:     */s/ Ryan Loveless*
James L. Etheridge
Texas Bar No. 24059147
Ryan S. Loveless
Texas Bar No. 24036997
Brett A. Mangrum
Texas Bar No. 24065671
Travis L. Richins
Texas Bar No. 24061296
Jeffrey Huang
Brian M. Koide
Etheridge Law Group, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jhuang@EtheridgeLaw.com
Brian@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this the 8th day of January, 2021.

*/s/ James L. Etheridge*

James L. Etheridge